ORIGINAL
FILED

07 OCT -9 PH 2: 55

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

STEPHEN L. PORTER
WHITEHEAD & PORTER LLP
220 Montgomery, Suite 1850
San Francisco, California 94104
Telephone: (415) 781-6070

Local Counsel for Plaintiff

ROBERT C. FINKEL
NATALIE MACKIEL
WOLF POPPER LLP
845 Third Avenue
New York, NY 10022
Tel.: 212.759.4600
Fax : 212.486.2093

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

MMC

C 07 5168

| | |
|---|---|
| DENNIS KOESTERER, on behalf of himself and all others similarly situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>BIGBAND NETWORKS, INC., AMIR BASSAN-ESKENAZI, FREDERICK A. BALL, RAN OZ, LLOYD CARNEY, DEAN GILBERT, KEN GOLDMAN, GAL ISRAELY, BRUCE SACHS, ROBERT SACHS, and GEOFFREY YANG,<br><br>                    Defendants. | Civil Action No.:<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

Plaintiff, Dennis Koesterer ("Plaintiff"), alleges the following based upon the investigation of Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission (the "SEC") filings, wire and press releases published by and regarding

Doc. 158408

BigBand Networks, Inc. ("BigBand" or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

## NATURE OF THE ACTION

1.     This is a federal class action brought by Plaintiff on behalf of all purchasers of the BigBand common stock between March 14, 2007 and September 27, 2007 (the "Class Period"), including purchasers of BigBand common stock pursuant or traceable to the Company's amended registration statement given effect on March 14, 2007 ("Registration Statement"), and the prospectus dated March 14, 2007 (individually and collectively with the Registration Statement, the "Prospectus") issued in connection with the Company's initial public offering on or about March 14, 2007 (the "Offering" or the "IPO"). The complaint seeks to pursue remedies under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.     BigBand is a provider of broadband multimedia infrastructure for video, voice and data founded in 1998. BigBand is incorporated in Delaware and headquartered in Redwood City, California, with research and development facilities in Westborough, Massachusetts, Tel Aviv, Israel and Redwood City, California.

3.     On March 14, 2007 BigBand and Company insiders completed an IPO, selling 7.5 million shares of BigBand common stock from the Company and 4.8 million shares of BigBand common stock from selling stockholders, for a total of 12.3 million shares at $13 per share for gross proceeds totaling $159.9 million.

4.     Throughout the Class Period, however, Defendants failed to disclose that the Company had achieved revenue growth and profitablity in the second half of 2006 only as a result of non-recurring orders from Verizon, and that BigBand would not achieve further revenue growth from Verizon until it worked off that inventory purchased in late 2006 and early 2007. Rather, defendants misrepresented the truth with regard to Verizon's need to deplete its excess inventory and stated that BigBand would achieve aggressive revenue and profit projections. BigBand also failed to disclose that it was experiencing delays in customizing certain of its products for other customers, and that its

Doc.

2

1  inability to achieve customer acceptance of those products was contributing to its failure to achieve
2  revenue and profit projections.

3      5.    Six months after going public, after the market closed on September 27, 2007,
4  BigBand announced that it was revising its revenue outlook for the third quarter ending September
5  30, 2007. The Company revealed that it now expected to report revenue for the third quarter in the
6  range of $35 million to $39 million, substantially below the Company's previous guidance of $54
7  million to $58 million. BigBand attributed the dramatic decline in expectations because one customer
8  (Verizon) had excessive inventory of BigBand's products and was not expected to increase its
9  purchases from BigBand for a number of quarters, and BigBand was having difficulty obtaining
10 customer acceptance of other products that was necessary for revenue recognition. BigBand stated
11 that the customer acceptance issues, as well, were expected to persist for a number of quarters.

12     6.    After absorbing this news, the market reacted swiftly and negatively. Shares of the
13 Company's stock sank $2.67 per share, or 29.4 percent, to close, on September 28, 2007, at $6.40 per
14 share.

**JURISDICTION AND VENUE**

15     7.    The claims asserted herein arise under and pursuant to Sections 11 and 15 of the
16 Securities Act [15 U.S.C. §§ 77k and 77o] and Sections 10(b) and 20(a) of the Exchange Act, [15
17 U.S.C. §§ 78j(b) and 78t(a)], and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

18     8.    This Court has jurisdiction over the subject matter of this action pursuant to Section
19 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa] and
20 28 U.S.C. § 1331.

21     9.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act,
22 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein occurred
23 in substantial part in this Judicial District.

24     10.   In connection with the acts, conduct and other wrongs alleged in this complaint,
25 defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

Doc.

3

including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.    As set forth in the attached Certification, Plaintiff purchased BigBand common stock during the Class Period at artificially inflated prices and was damaged thereby.

12.    Defendant BigBand is a Delaware corporation, with its principal place of business located at 475 Broadway Street, Redwood City, California 94063.

13.    Defendant Amir Bassan-Eskenazi ("Bassan-Eskenazi") was at all relevant times the Company's Chief Executive Officer, President, Co-founder and Chairman of the Board of Directors. Defendant Bassan-Eskenazi signed the Company's Registration Statement.  Defendant Bassan-Eskenazi sold 400,058 shares in the BigBand IPO for proceeds of $5.20 million.

14.    Defendant Frederick A. Ball is Senior Vice President and Chief Financial Officer of BigBand.  Defendant Ball signed or authorized the signing of the Company's false and misleading Registration Statement.

15.    Defendant Ran Oz ("Oz") was, at all relevant times BigBand's Chief Technology Officer, Co-founder and Director.  Defendant Oz signed the Company's Registration Statement via a power of attorney granted to Company Vice President and General Counsel, Robert Horton. Defendant Oz serves as a Director on behalf of Oz Holdings, Inc.  Oz Holdings, Inc. sold 400,000 shares in the IPO for proceeds of $5.20 million.

16.    Defendant Lloyd Carney ("Carney") was, at all relevant times, a Director of the Company. Defendant Carney signed the Company's Registration Statement via a power of attorney granted to Company Vice President and General Counsel, Robert Horton.

17.    Defendant Dean Gilbert ("Gilbert") was, at all relevant times, a Director.  Defendant Gilbert signed the Company's Registration Statement via a power of attorney granted to Company Vice President and General Counsel, Robert Horton.  Mr. Gilbert serves on BigBand's Board as the representative of Sandalwood Investments II, L.P. Defendant Gilbert and/or Sandalwood Investments

Doc.

4

sold 20,109 shares in the BigBand IPO for proceeds of $261,417.

18.    Defendant Ken Goldman ("Goldman") was, at all relevant times, a Director of the Company. Defendant Goldman signed the Company's Registration Statement via a power of attorney granted to Company Vice President and General Counsel, Robert Horton.

19.    Defendant Gal Israely ("Israely") was, at all relevant times, a Director of the Company. Defendant Israely signed the Company's Registration Statement via a power of attorney granted to Company Vice President and General Counsel, Robert Horton.  Mr. Israely serves on BigBand's Board on behalf of Cedar Funds.  Cedar Funds sold 446,229 shares in the BigBand IPO for proceeds of $5.8 million.

20.    Defendant Bruce Sachs ("Bruce Sachs") was, at all relevant times, a Director of the Company.  Defendant Bruce Sachs signed the Company's Registration Statement via a power of attorney granted to Company Vice President and General Counsel, Robert Horton.  Bruce Sachs is a General Partner of Charles River Ventures and serves as Charles River's designee on BigBand's Board of Directors.

21.    Defendant Robert Sachs ("Robert Sachs") was, at all relevant times, a Director of the Company.  Defendant Robert Sachs signed the Company's Registration Statement via a power of attorney granted to Company Vice President and General Counsel, Robert Horton.

22.    Defendant Geoffrey Yang ("Yang") was, at all relevant times, a Director of the Company.  Defendant Yang signed the Company's Registration Statement via a power of attorney granted to Company Vice President and General Counsel, Robert Horton.  Defendant Yang is a Partner at Redpoint Ventures, and serves on BigBand's Board of Directors as the designee of Redpoint Ventures.

23.    Defendants Bassan-Eskenazi, Oz, Carney, Gilbert, Goldman,  Israely, Bruce Sachs, Robert Sachs and Yang are collectively referred to hereinafter as the Individual Defendants. The Defendants, because of their positions with the Company, possessed the power and authority to control the contents of BigBand's quarterly reports, press releases and presentations to securities

Doc.

5

analysts, money and portfolio managers and institutional investors.

## SUBSTANTIVE ALLEGATIONS

24.    BigBand is a provider of broadband multimedia infrastructure for video, voice and data founded in 1998.  BigBand is incorporated in Delaware and headquartered in Redwood City, California, with research and development facilities in Westborough, Massachusetts, Tel Aviv, Israel and Redwood City, California.

25.    BigBand recognizes revenue primarily from the sale of products, and also recognizes revenue from the sale of services.  For 2006, $154.0 million of net revenue (or approximately 87.2% of total net revenue) was attributable to the sale of products. $22.6 million in net revenue (or approximately 12.8% of net revenue) was attributable to the sale of services.

26.    BigBand product sales are divided primarily into three markets: Telco-TV, switched broadcast video ("SBV"), and data.

27.    BigBand's TelcoTV products are sold to telephone companies that use BigBand's broadband multimedia-service router (BMR) for the real-time processing and switching of video. BigBand's Telco-TV sales have historically been predominantly sales to Verizon. BigBand states in its public SEC filings that its Telco-TV products "provide[ ] significant cost savings as telephone companies are not required to build a dedicated video transport network."

28.    According to BigBand's SEC filings, BigBand's switched broadcast products "enable service providers to transmit video channels to subscribers only when the subscribers in a smaller subset of subscribers within the network, called a service group, are in the process of watching those channels.... [O]ur Switched Broadcast product application typically allows service providers to achieve up to 50% bandwidth savings in the delivery of digital video content and use the reclaimed bandwidth to offer additional content."

29.    On or about March 14, 2007 BigBand filed with the SEC a Form S-1 Amended Registration Statement (the "Registration Statement"), for the IPO. The SEC issued an Effectiveness Order and the S-1 became effective on March 14, 2007.

Doc.

30.    On or about March 14, 2007, the Company's Prospectus with respect to the IPO became effective, allowing the Company to sell 7.5 million shares of BigBand common stock from the Company and 4.8 million shares of BigBand common stock from selling stockholders, for a total 12.3 million shares at $13 per share for proceeds totaling $159.9 million.

31.    In the Prospectus, BigBand represented, among other things, that it had experienced 80% revenue growth from 2005 to 2006 (from $98.0 million to $176.6 million) and had operated profitability in the third and fourth quarters of 2006 and for 2006 as a whole:

> We develop, market and sell network-based platforms that enable cable operators and telephone companies, collectively called service providers, to offer video, voice and data services across coaxial, fiber and copper networks.... We have significant expertise in rich media processing, communications networking and bandwidth management. We have delivered what we believe to be the only successful commercial deployments of switched broadcast, an application that substantially increases the volume of content that a service provider can offer. In addition, we were the first to implement what we believe has become the industry's de facto network architecture for digital simulcast, an application that facilitates the insertion of advertising and the transmission of video in a digital format across a network while still providing service to analog subscribers. Our product applications of Digital Simulcast, TelcoTV, Switched Broadcast, and High-Speed Data and Voice-over-IP are a combination of our modular software and programmable video and data hardware platforms.

> Our software and hardware product applications are used by leading service providers worldwide to offer video, voice and data services to tens of millions of subscribers, 24 hours a day, seven days a week. We have sold our product applications to more than 100 customers globally, including Cablevision, Charter, Comcast, Cox, Time Warner Cable and Verizon, which are six of the ten largest service providers in the United States. Our net revenues increased 80.3% to $176.6 million for the year ended December 31, 2006 from $98.0 million in 2005. We have been profitable on a quarterly basis since the three months ended September 30, 2006, and we first achieved profitability on an annual basis in 2006.

32.    In the Company's Prospectus, BigBand stated that the $68.00 million in product sales during 2006 were caused by a $87.6 million increase in revenues from video products, partially offset by a $19.6 million decrease in revenues from data products. The Prospectus further stated that a primary reason for the $87.6 million growth in product revenues during 2006 was the first recognition of significant net revenues from BigBand's TelcoTV product :

> Net revenues for 2006 were $176.6 million compared to $98.0 million for 2005, an increase of $78.6 million, or 80.3%. Revenues from our top five customers

7

Doc.

comprised 79% and 69% of net revenues for 2006 and 2005, respectively. During 2006, revenues from customers in the United States comprised 89% of net revenues, and revenues from customers outside the United States comprised 11% of net revenues, compared to the same period in 2005, in which customers in the United States comprised 83% of net revenues, and revenues from customers outside the United States comprised 17% of net revenues.

Products revenues for 2006 were $154.0 million compared to $86.0 million for 2005, an increase of $68.0 million, or 79.2%. This increase was primarily due to a $87.6 million increase in revenues from our video products, partially offset by a $19.6 million decrease in revenues from our data products. The $87.6 million increase in video products was attributable to the first recognition of significant net revenues from our TelcoTV product and significant growth in revenues from our Switched Broadcast product. The decrease in revenues from data products was almost entirely due to $18.8 million of revenues recognized in 2005 following satisfaction of customer acceptance criteria for product shipped to a single customer in 2004.

33.    According to the Prospectus, although BigBand's "sales cycle for an initial customer purchase typically ranges from nine to eighteen months ... [a]fter initial deployment of our products, subsequent purchase of our products typically have a more compressed sales cycle."

34.    BigBand sells its products and services to customers in the United States through a direct sales force. In 2006, approximately 89% of BigBand's sales were to customers in the United States.

35.    The Prospectus stated that BigBand's sales were highly concentrated among its five largest customers, and had over time become more concentrated in those customers, reaching a concentration of 90% of revenue in the fourth quarter of 2006. The Prospectus further indicated that 2006 sales were concentrated among four customers (Comcast, Cox, Time Warner Cable and Verizon) that each represented more than 10% of sales during 2006:

A substantial majority of our sales have been to relatively few customers. However, our large customers have changed over time. Sales to our five largest customers represented 79%, 69% and 61% of our net revenues in the year ended December 31, 2006, the year ended December 31, 2005, and the year ended December 31, 2004, respectively, and were particularly significant in the three months ended December 31, 2006 when they represented approximately 90% of our net revenues. In 2006, Comcast, Cox, Time Warner Cable and Verizon each represented 10% or more of our net revenues. In 2005, Adelphia, Cox and Time Warner Cable each represented 10% or more of our net revenues. In 2004, Adelphia, Comcast, Cox and Time Warner Cable each represented 10% or more of our net revenues. Although we are attempting to broaden our customer base by penetrating new markets and expanding

internationally, we expect continuing customer concentration due to the significant capital costs of constructing service provider networks and industry consolidation. We expect that in future periods a limited number of large customers will continue to comprise a large percentage of our revenues.

36.     In the Company's Prospectus, BigBand stated that the Company had maintained a backlog of "firm purchase orders by customers for delivery within the next six months:"

We schedule production of our products based upon our backlog, open contracts, informal commitments from customers and sales projections. Our backlog consists of firm purchase orders by customers for delivery within the next six months. As of December 31, 2006, we had backlog of $36.2 million, compared with backlog of $33.1 million as of December 31, 2005. Anticipated orders from customers may fail to materialize and delivery schedules may be deferred or canceled for a number of reasons, including reductions in capital spending by service providers or changes in specific customer requirements. Because of the complexity of our customer acceptance and revenue recognition criteria, in addition to backlog, we have significant deferred revenues. As a result, our backlog alone is not necessarily indicative of revenues for any succeeding period.

37.     The Prospectus reported that for the fourth quarter of 2006, BigBand had achieved $56.7 million in net revenue and $8.9 million in net income.

38.     The statements referenced above were each materially false and misleading because they failed to disclose and misrepresented the following adverse facts, among others: (1) that the Company engaged in channel stuffing prior to the IPO on sales of TelcoTV products to Verizon, thus distorting the growth in its sales; and (2) BigBand was experiencing difficulty in customizing its other products, resulting in delays in customer acceptance of those products.

39.     In reliance on the truth and accuracy of the representations contained in the Prospectus with respect to BigBand's business, BigBand common stock traded from March 15, 2007 (the first day BigBand common stock traded) and May 3, 2007 between $17.00 and $21.43 per share.

40.     On May 3, 2007, after the close of trading on U.S. securities markets, BigBand issued a press release reporting first quarter 2007 financial results. For the quarter ended March 31, 2007, BigBand reported net revenues of $52.8 million (62% over the prior year) and a GAAP net loss of $1.0 million (or $0.05) per diluted share. The company reported that non-GAAP results (excluding certain non-cash charges) were $5.8 million, or $0.09 per diluted share.

Doc.

9

41.    Defendants Bassan-Eskanazi was quoted in the press release as stating:

During the quarter, we continued to see an expansion of out installed base of solutions and of the capacity of our existing footprint, which favorably benefitted our gross margin.

* * *

We believe that our financial achievements to date demonstrate the increasing consumer demand for more and better video services, including high-definition programming. Our growth continues to be a function of the broader adoption of our switched broadcast solution by major cable operators and the increasing deployment of television services by telecommunications carriers, among other initiatives.

42.    The May 3, 2007 press release reported that management anticipated that net revenues for the second quarter of 2007 would be in the range of approximately $52 to $56 million and that GAAP earnings per share would be in the range of $0.02 to $0.06 per share. For 2007, net revenues were anticipated to be in the range of approximately $225 to $230 million per share, and GAAP earnings per share were anticipated to be in the range of $0.06 to $0.11 per share.

43.    On a conference call conducted immediately after the issuance of the May 3, 2007 press release defendant Bassan-Eskenazi stated that BigBand's "switched broadcast solution continue to be a major driver of our business... We are now deploying our fourth-generation switched broadcast product, while many competitors are still developing their first. And switched broadcast is a fraction of the cost of competing alternatives.... Time Warner Cable was the first major cable operator to adopt switched broadcast. During the first quarter of 2007, we recognized revenue associated with Cablevision's deployment of switched broadcast, the second [Multiple System Operator] to adopt our solution."

44.    Bassan-Eskanazi further stated that BigBand was seeing "continuing demand for our Telco TV solutions" in the first quarter:

BigBand carrier-grade platform is deployed at the edge of our Telco customers' networks and is used to ensure reliable and efficient delivery of TV programming. We continue to support the ongoing rollout of Verizon's FiOS TV. Our ability to successfully deploy with this important customer gives us the confidence in our platform fit for Telco TV, as well as validates our ability to add value to this important market segment.

45.    On that same conference call, defendant Ball assured investors that he had good visibility on projecting second quarter operations and at the end of the second quarter would have an equally good basis for projecting third quarter operations: "I still view the world as a kind of six-month window. I have a ... pretty good view of Q2. I have a little bit less so view of Q3. There are some things that have to happen in Q2 for me to fill in Q3...."

46.    With regard to certain orders where the products had not yet been deployed, Ball stated that "our typical pattern from switched broadcast orders is kind of a six-to-nine month window to revenue or sign-off by the customers," and those orders where products had not been deployed were not included in current period projections.

**The Market Begins to Learn the Nature and Magnitude of the Misrepresentations**

47.    On August 2, 2007, after the close of the U.S. securities markets, BigBand issued a press release reporting second quarter 2007 operating results. Net revenues for the second quarter were reported of $54.4 million (43% over the prior year). GAAP net income for the quarter was $1.7 million, or $0.02 per diluted share. Defendant Bassan-Eshenazi was quoted in the press release as stating:   "We continued to drive significant expansion of the footprint of our media service platforms."

48.    The August 2, 2007 press release added that management's current expectations for the third quarter were net revenues of approximately $54 to $58 million, and GAAP earnings (loss) per share in the range of ($0.01) to $0.03 per share. For the full year, the company reiterated that net revenues were anticipated to be in the range of approximately $225 to $230 million, and that GAAP earnings per share were anticipated to be in the range of $0.03 to $0.08 per share.

49.    On a conference call conducted on August 2, 2007, immediately after issuance of the August 2, 2007 press release, defendant Bassan-Eskenazi sought to quell investor discontent caused by the reduced income forecast. Bassan-Eskenazi assured investors that "[w]e are growing our top-line as a direct impact of the healthy demand for the unique video solutions which drive strategic footprint growth with key customers." Bassan-Eskanzi added that "[t]he competition

among cable, satellite and telecom providers is accelerating, and is causing all of them to invest heavily and add new capabilities to their network.  As a result of these growing industry trends, in the second quarter we experienced footprint growth, meaningful design wins, and significant milestones."

50.    On September 27, 2007, after the close of trading on U.S. securities markets, BigBand issued a further press release revising "its revenue outlook for the third quarter ending September 30, 2007" down to "the range of $35 to $39 million," which was "below the Company's previous guidance of $54 to $58 million."  BigBand's revised revenue forecast for the third quarter reflected no growth over revenue for the third quarter of 2006.

51.    BigBand attributed the reduced revenue outlook "to several coincident factors," as follows, including that Telco-TV revenue was reduced because a "major customer" (presumably Verizon) "worked through some previously purchased inventory":

I.    "Some ... deployments have required more software customization and integration than originally expected.  This impacted the Company's ability to recognize switched digital revenue for some deployments in the third quarter."

ii.    "The Company also experienced slowdown in Telco-TV revenue, as its major customer worked through some previously purchased inventory."

iii.    "[T]he Company experienced continued softness in its data business."

52.    The September 27, 2007 press release added that "[a]s a result of lower revenue expectations, BigBand expects to report an operating loss for the third quarter of fiscal year 2007."

53.    After absorbing this news, the market again reacted swiftly and negatively.  Shares of the Company's stock sank $2.67 per share, or 29.4 percent, to close, on September 28, 2007, at $6.40 per share.

54.    Morgan Keegan analyst Simon Leopold cut his rating on the stock to market perform from outperform, saying "the challenges affecting this quarter will cascade into multiple

Doc.

1  quarters and our estimates fall precipitously." Jefferies & Co. also cut its rating on the company

2  to hold from buy.

### CLASS ACTION ALLEGATIONS

4      55.    Plaintiff brings this action as a Class Action pursuant to Rule 23(a) and (b)(3) of

the Federal Rules of Civil Procedure on behalf of a Class consisting of all purchasers of the

publicly traded securities of BigBand between March 14, 2007 and September 27, 2007, including

purchasers of BigBand securities pursuant or traceable to the Registration Statement and

Prospectus issued in connection with the Company's IPO. Excluded from the Class are

defendants, the officers and directors of the Company, at all relevant times, members of their

immediate families and their legal representatives, heirs, successors or assigns and any entity in

which defendants have or had a controlling interest.

    56.    At all relevant times, the market for BigBand securities was an efficient market for

the following reasons, among others:

    a.    BigBand securities met the requirements for listing, and was listed, on the

        NASDAQ, an efficient and automated market;

    b.    During the Class Period, thousands of shares of BigBand securities were

        traded on the open market;

    c.    As a regulated issuer, BigBand filed periodic public reports with the SEC

        and the NASDAQ; and

    d.    BigBand was followed by several securities analysts employed by

        brokerage firms who wrote reports that were distributed to the sales force

        and certain customers of their respective brokerage firms. These reports

        were publicly available and entered the public marketplace.

    57.    As a result, the market for BigBand securities promptly digested current

information regarding the Company from all publicly available sources and reflected such

information in BigBand's share price. Under these circumstances, all purchasers of the

1  Company's common shares during the Class Period suffered similar injury through their purchase

2  of shares at artificially inflated prices and a presumption of reliance applies.

3      58.    This action is properly maintainable as a class action because:

        a.    The members of the Class are so numerous and geographically diverse that joinder of all of them is impracticable. Throughout the Class Period, BigBand securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class;

        b.    Plaintiff's claims are typical of the claims of the other members of the Class, as Plaintiff and the members of the Class purchased BigBand shares and sustained damages as a result of the defendants' wrongful conduct complained of herein;

        c.    Plaintiff is a representative party who will fairly and adequately protect the interests of the other members of the Class and has retained counsel competent and experienced in class action securities litigation.  Plaintiff has no interests antagonistic to, or in conflict with, the Class it seeks to represent;

        d.    A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein. As the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation

14

Doc.

make it virtually impossible for the Class members individually to redress the wrongs done to them. The likelihood of individual Class members prosecuting separate claims is remote;

e.  The questions of law and fact common to the members of the Class predominate over any questions affecting individual members of the Class. The questions of law and fact which are common to Plaintiff and the Class include, among others:

I.  whether the federal securities laws were violated by defendants' acts as alleged herein;

ii.  whether statements disseminated to the investing public and to BigBand's shareholders during the Class Period misrepresented material facts about the operating results and financial condition of the Company;

iii.  whether defendants acted with knowledge or with reckless disregard for the truth in misrepresenting and/or omitting to state material facts;

iv.  whether, during the Class Period, the market price of BigBand securities was artificially inflated due to the material misrepresentations and/or non-disclosures complained of herein;

v.  whether the defendants participated in and pursued the common course of conduct complained of herein; and

vi.  whether the members of the Class have sustained damages and, if so, what is the proper measure thereof;

59.  Plaintiff anticipates no unusual difficulties in the management of this action as a class action.

**Count I**

**AGAINST ALL DEFENDANTS FOR VIOLATION OF SECTION 11
OF THE SECURITIES EXCHANGE ACT**

60.     Plaintiff repeats and realleges each and every allegation contained above, excluding all allegations above that contain facts necessary to prove any elements not required to state a Section 11 claim, including without limitation, scienter.

61.     This claim is brought by Plaintiff and all other members of the Class who obtained BigBand securities pursuant to the Registration Statement. Each Class member acquired their shares pursuant to or traceable to, and in reliance on, the Prospectus.

62.     Individual Defendants as signatories of the Registration Statement and the Prospectus, as directors and/or officers of BigBand and controlling persons of the issuer, owed to the holders of the securities obtained through the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and the Prospectus at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

63.     None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and the Prospectus were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

64.     Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Prospectus, which misrepresented or failed to disclose, inter alia, the facts set forth above. By reason of the conduct herein alleged, each defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

65.     As a direct and proximate result of defendants' acts and omissions in violation of the Securities Act, Plaintiff and the Class suffered substantial damage in connection with their ownership

of BigBand securities pursuant to the Registration Statement and the Prospectus.

66.    BigBand is the issuer of the securities sold via the Registration Statement. As issuer of the securities, the Company is strictly liable to Plaintiff and the Class for the material misstatements and omissions therein.

67.    At the times they obtained their shares of BigBand, the Plaintiff and members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

68.    This action is brought within one year after discovery of the untrue statements and omissions in and from the Prospectus should have been made through the exercise of reasonable diligence, and within three years of the effective date of the Prospectus.

69.    By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the defendants and each of them, jointly and severally.

## COUNT II

### AGAINST ALL DEFENDANTS FOR VIOLATION OF
### SECTION 15 OF THESE SECURITIES ACT

70.    Plaintiff repeats and realleges each and every allegation contained above, excluding all allegations above that contain facts necessary to prove any elements not required to state a Section 15 claim, including without limitation, scienter.

71.    This count is asserted against Individual Defendants and is based upon Section 15 of the Securities Act.

72.    Individual Defendants, by virtue of their offices, directorship and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of BigBand within the meaning of Section 15 of the Securities Act. Individual Defendants had the power and influence and exercised the same to cause BigBand to engage in the acts described herein.

73.    Individual Defendants' position made them privy to and provided them with actual

17

Doc.

1  knowledge of the material facts concealed from Plaintiff and the Class.

2      74.    By virtue of the conduct alleged herein, Individual Defendants are liable for the

3  aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered.

4  **COUNT III**

5  **AGAINST DEFENDANTS BIGBAND NETWORKS, INC., AMIR BASSAN-ESKENAZI,**
**AND FREDERICK A. BALL FOR VIOLATION OF SECTION 10(b) OF THE**
**SECURITIES EXCHANGE ACT AND RULE 10b-5 THEREUNDER**

6

7      75.    Plaintiff repeats and realleges each and every allegation above, as if set forth in full

8  herein.

9      76.    Throughout the Class Period, defendants, individually and in concert, directly or

10 indirectly, engaged in a common plan, scheme and course of conduct described herein, pursuant to

11 which they knowingly or recklessly engaged in acts, transactions, practices and a course of

12 business which operated as a fraud upon Plaintiff and the other members of the Class; made

13 various false statements of material facts and omitted to state material facts to make the

14 statements made not misleading to Plaintiff and the other members of the Class; and employed

15 manipulative or deceptive devices and contrivances in connection with the purchase and sale of

16 BigBand securities.

17

18     77.    The purpose and effect of defendants' plan, scheme and course of conduct was to

19 artificially inflate the price of BigBand's securities and to artificially maintain the market price of

20 BigBand securities.

21     78.    The Individual Defendants, who were the top officers of the Company, had actual

22 knowledge of the material omissions and/or the falsity of the material statements set forth above,

23 and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted

24 with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the

25 statements made by them or other BigBand personnel to members of the investing public,

26 including Plaintiff and the Class, and the securities analysts.

27

28     79.    As a result of the foregoing, the market price of BigBand securities was artificially

Doc.

inflated during the Class Period. In ignorance of the falsity of the defendants' statements concerning the operating results and performance of BigBand, Plaintiff and the other members of the Class relied, to their damage, on the statements described above and/or the integrity of the market price of BigBand securities during the Class Period in purchasing BigBand securities at prices which were artificially inflated as a result of defendants' false and misleading statements.

80.    Had Plaintiff and the other members of the Class known of the material adverse information which defendants did not disclose, they would not have purchased BigBand securities at the artificially inflated prices that they did.

81.    Defendants' concealment of this material information served only to harm Plaintiff and the other members of the Class who purchased BigBand securities in ignorance of the financial risk to them as a result of such nondisclosures.

82.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

83.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding BigBand, their control over, and/or receipt and/or modification of BigBand's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning BigBand, participated in the fraudulent scheme alleged herein.

84.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, there was no statement made with respect to any of those representations forming the basis of this Complaint that actual results "could differ materially from those projected," and there were no meaningful cautionary statements identifying relevant important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the defendants had actual knowledge that the particular forward-looking statement was false.

85.    The statutory safe harbor provided for forward-looking statements under certain circumstances, moreover, does not apply to false statements or material omissions of existing facts.

86.    By reason of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of BigBand securities during the Class Period.

**COUNT IV**

**AGAINST THE INDIVIDUAL DEFENDANTS UNDER SECTION 20(A) FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT**

87.    Plaintiff repeats and realleges each and every allegation above, as if set forth in full herein.

88.    During the Class Period, each of the Individual Defendants, by virtue their offices at, and directorship of BigBand and their specific acts, was a controlling person of BigBand within the meaning of Section 20(a) of the Exchange Act.

89.    Each Individual Defendant's positions made him privy to, and provided him with actual knowledge of, the material facts which the Individual Defendants and BigBand concealed

Doc.

1   from Plaintiff and the other members of the Class during the Class Period.

2       90.     Each of the Individual Defendants had the power and influence, and exercised

3   same, to engage in the unlawful conduct and practices complained of herein by causing BigBand

4   to disseminate the false and misleading information referred to above.

5       91.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a)

6   of the Exchange Act.

7       92.     By virtue of the conduct alleged above, the Individual Defendants are liable to the

8   Plaintiff and the other members of the Class for the substantial damages that they suffered in

9   connection with their purchases of BigBand's securities during the Class Period.

10      **WHEREFORE,** Plaintiff, on his own behalf and on behalf of the other members of the

11  Class, demands judgment against the defendants as follows:

12      A.      Determining that this action is properly maintainable as a class action pursuant to

13  Rule 23 of the Federal Rules of Civil Procedure;

14

15      B.      Certifying Plaintiff as the Class Representative and his counsel as Class Counsel;

16      C.      Declaring and determining that defendants violated the federal securities laws by

17  reason of their conduct as alleged herein;

18      D.      Awarding monetary damages against all defendants, jointly and severally, in favor

19  of Plaintiff and the other members of the Class for all losses and damages suffered as a result of

20  the acts and transactions complained of herein, together with prejudgment interest from the date

21  of the wrongs to the date of the judgment herein;

22      E.      Awarding Plaintiff the costs, expenses, and disbursements incurred in this action,

23  including reasonable attorneys' and experts' fees; and

24      F.      Awarding Plaintiff and the other members of the Class such other and further relief

25  as the Court may deem just and proper in light of all the circumstances of this case.

26                                  **JURY DEMAND**

27      Plaintiff demands a trial by jury.

28

Doc.

21

Dated: October 9, 2007

WHITEHEAD & PORTER LLP

By: s/ Stephen L. Porter

STEPHEN L. PORTER
220 Montgomery, Suite 1850
San Francisco, California 94104
Telephone: (415) 781-6070

Local Counsel for Plaintiff

ROBERT FINKEL
NATALIE MACKIEL
WOLF POPPER LLP
845 Third Avenue
New York, NY 10022
Tel.: 212.759.4600
Fax : 212.486.2093

Attorneys for Plaintiff

Doc.

22